GREER TRANSPORTATION COMPANY *v.*
W. SCOTT KNIGHT.

[No. 29, April Term, 1929.]

529

*Decided June 25th, 1929.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*J. F. H. Gorsuch, Jr.,* and *R. H. Archer,* with whom were *H. Courtenay Jenifer* and *J. Glasgow Archer, Jr.,* on the brief, for the appellant.

*A. Freeborn Brown,* with whom was *William P. Cole, Jr.,* on the brief, for the appellee.

SLOAN, J., delivered the opinion of the Court.

This is an appeal from a judgment in favor of the appellee (plaintiff), against the appellant (defendant). There are ten exceptions, of which the first six are to rulings on the evidence, the seventh to the overruling of the defendant's special exceptions to the plaintiff's first, second, and fourth prayers; the eighth to the granting of the plaintiff's prayers; the ninth to the sustaining of the plaintiff's special exceptions to the defendant's third, fifth, and eighth prayers; and the tenth to the refusal of the defendant's first, 1A, second, third, fifth, seventh, eighth, ninth, tenth, eleventh, and thirteenth prayers, the court having granted the defendant's fourth and sixth prayers.

The defendant's first prayer prayed the court to instruct the jury as a matter of law that the plaintiff was guilty of negligence contributing to the happening of the accident complained of; the defendant's 1A prayer was a demurrer to the evidence; the defendant's second prayer prayed an instruction that there was no evidence legally sufficient to prove negligence on the part of the driver of the defendant's truck. It is therefore necessary to discuss all the evidence in so far as it relates to the negligence of both parties, and the legal sufficiency of all the evidence.

On the morning of August 14th, 1928, the plaintiff, who was a farmer living near Hopewell in Harford County, Maryland, was driving his automobile on the Bel Air Road southward on his way to Baltimore, accompanied by his wife and his wife's sister. On the same road and going in the same direction, and to the rear of the appellee, Hale Rhudy was driving a milk truck for the Greer Transportation Company, the appellant. On a bridge at Stemmer's Run, between

Fullerton police station and Overlea, the cars came together, resulting in the plaintiff's car being badly damaged, and the occupants more or less injured.

The Bel Air Road at this point and vicinity was being improved by the addition of a ten-foot concrete shoulder. In the neighborhood of the accident, except for the length and width of the Stemmer's Run bridge, the concrete shoulders were at a higher elevation than the original part of the road between the shoulders, which had not yet been graded so as to conform with the grade of the shoulders. At a few places dirt had been placed on the old macadam bed so as to allow vehicles to be driven from the old roadbed on to the shoulder, or off the shoulder to the macadam. When the plaintiff came to the Stemmer's Run bridge, he attempted to drive from the macadam part of the road onto the right shoulder and, just as the front part of his car had gotten on the shoulder, the truck collided with the plaintiff's touring car, the front part of the truck hitting the touring car on the right side between the front and rear wheels. The appellant vigorously charges the appellee with contributory negligence for not giving its driver some warning of his intention to leave the macadam portion of the road and proceed southward on the shoulder, but it is our opinion that the record shows no act of negligence on the part of the appellee contributing to the accident.

We cannot yield to the suggestion or inference to be drawn from the appellant's contention that, because the Bel Air Road was under repair and improvement, this made any change in the well recognized "rule of the road." If the condition of the road at the point of the accident meant anything to travelers, it would be that greater care should be demanded of a user to make travel safe for others, and the mere addition of the shoulders before the macadam center was regraded did not give any one who might be riding the shoulder the right to appropriate it to the exclusion of any who might be in his way. This brief statement of the situation of the parties at the point of the collision, it seems to us, is ample to show that there was a sufficient proof of negligence of the

appellant's driver to entitle the plaintiff to have the case submitted to the jury.

The first exception was to questions put to Dr. William S. Archer, a physician residing in Bel Air, who had twice examined the plaintiff, the first time early in October, and the last time about the middle of November, and who testified that from his two examinations, in his opinion, the plaintiff was suffering from a concussion of the spinal cord, the effect of which does not usually appear at once, but is progressive, and that between the two examinations the case had slightly progressed. The question objected to was, "Doctor, from the examination which you have made of Mr. Knight and of the detailed complaint of his suffering and so forth, what are the probabilities for his getting over it?" to which the court added, "Change that to examinations made in October and November," the second exception being on the motion to strike out the answer to this question, which was: "The history of these cases is that this disease is progressive." The third and fourth exceptions were to variations of the first question excepted to, the final answer of Dr. Archer being: "From this slight progression of the trouble up to the time of the middle of November, by which time he should have recovered from minor injuries, the probability—I do not say it is certain—but the probability is that they would continue to increase. That is just my view of it."

On cross-examination witness testified that when plaintiff came to him in November he stripped him and went over his back, and the plaintiff told him the pains were in the same place that he previously told him they were in October. Q. Now, doctor, you relied more on his physical actions and his complaints than you did upon your own physical examination of him, did you not? A. Relied more on his actions and what else? Q. And what he said to you. A. And what he said; yes. When you believe a man is truthful and he comes to consult a physician, why you have got to accept his story, but of course that was not enough. Q. Under certain circumstances I agree with you. A. Then I say, in addition

to that there was his general appearance that showed a lower tone, no paralysis, he had a—except you might say in, I think it was his left leg, he did not have the same control over it and had a certain amout of pain in that. That was the result of the first examination. His eyesight—and, by the way, that blurring you see—this concussion does not affect the eyes at once, it often comes on later. However, that was still there; things looked blurred to him. The point of that was that he had never noticed that before. I tried to give him a thorough examination to satisfy myself."

Witness further testified that plaintiff had concussion of the spinal cord, so as to affect him in the manner described, which could not be detected by X-rays, as X-rays do not tell everything.

The fifth and sixth exceptions were to the overruling of objections to questions put to Dr. Charles Richardson, who had made an examination of the plaintiff on November 16th, 1928, and again on January 18th, 1929, the first of the questions being, "From the examination and the tenderness and so forth that you found upon your examination, what effect, if any would that have upon him working as a farmer?" which was not answered but was followed by the question, unobjected to, "There was not any improvement?" the answer of the doctor being, "I did not notice if there was"; the next question excepted to being, "From the examination and the tenderness and so forth that you found upon your examination, what effect, if any, would that have upon him working as a farmer?" to which was answered: "Well, it has been several months since this accident occurred, and they did not seem to be improving the way these cases do as a rule to make complete and quick recovery. Therefore it looks like it might be a chronic case."

Dr. Gallion, the plaintiff's family physician, who was called to the plaintiff's house the day after the accident, testified that at that time the only evidence of injury he found upon his examination was that the plaintiff had a slight swelling on the left side of his neck; complained of having muscular soreness more or less all over his body; was able

to move about and walk around; was in his yard when the doctor called; that he prescribed rest and advised hot applications in case the swelling did not disappear in a day or two. He saw him again August 19th, when the plaintiff complained of his back hurting him when he stooped over or lifted anything, and the doctor said that, when be pressed him in the regions where he complained, the plaintiff would flinch; that he saw him again on August 25th, when he was still complaining; didn't see him again until November 9th, when he prescribed medicine and strapped the lumbar region of his back and the upper part of the sacral region with adhesive; that, if an injury similar to the one complained of by the plaintiff is severe enough, it is impossible to use the muscles without some pain; that the injuries of which the plaintiff complained would be the probable and natural result of injuries such as Mr. Knight described as having been received in this accident; that if the injury is confined entirely to the muscles it would clear up, but if the bones in that location are injured, the result of that would to a certain extent interfere with his work as a farmer.

The plaintiff, his wife, and sister testified that, after the collision, they went to the Fullerton police station and then to Baltimore, where they attended to some business before returning to their home in Harford County. Drs. Richardson and Archer both testified that they knew nothing about the movements of the plaintiff immediately after the accident when they made their respective examinations of him, and it is because of their lack of this knowledge and the failure of the plaintiff to disclose this fact to those physicians, and his failure also to inform them of his treatment by Dr. Gallion, that they insisted so vigorously upon the application to the testimony of the two physicians in this case of what was said in the case of *Gordon v. Opalecky,* 152 Md. 536, at page 548; a statement which in our opinion has no application to the testimony of Drs. Archer and Richardson at all. In that case it was said that the question should not have been allowed "because it asked the witness to say in so many words whether the condition in which he

found Mrs. Opalecky was caused by her injury, but it omitted facts proved in the case which must have had a vital and important influence in determining his answer to it." In the instant case neither of the two physicians whose testimony was excepted to undertook to ascribe the condition of the appellee to the accident, but merely gave their opinions based upon their respective examinations of the appellant and stated as a fact what they found. Aside from this there was sufficient evidence in the case for the jury to say whether in their judgment the injuries testified to by the plaintiff left him in the condition found by Drs. Archer and Richardson.

There was evidence offered of the results of an X-ray examination, and the testimony of a nerve specialist to the effect that the appellee could not have sustained the injuries claimed as a result of the accident, but the verdict shows that the jury decided in favor of the opinions of Drs. Archer and Richardson. If those physicians had testified that their opinions would have been different if they had been informed of the actions and activities of the plaintiff after the accident, then the trial court would have been justified in refusing the questions objected to or in striking out the answers thereto, but there is nothing in the record to show that there would have been any variation in the conclusions from their examinations even if they had had this additional information. They did testify that they knew he had been in an automobile wreck, but there is nothing in the record to show that this fact influenced their opinions as to his injuries or the likelihood of permanent results therefrom. We, therefore, do not consider the questions excepted to objectionable.

The next exception, the seventh, is to the overruling of the defendant's special exceptions to the granting of the plaintiff's first prayer, because (1) there was no evidence legally sufficient to show that the truck of the defendant while proceeding south on the Bel Air Road overtook the automobile of the plaintiff; (2) there was no legally sufficient evidence to show that the truck of the defendant attempted to pass the automobile of the plaintiff while going in the same direction, "and which had been overtaken as aforesaid, on the

536

right hand side of the plaintiff's car"; (3) there was no legally sufficient evidence to show that at the time of the accident the way ahead on the left side of the Bel Air Road was clear of approaching traffic; (4) special exception to the granting of the plaintiff's second prayer because there was no legally sufficient evidence to show that the plaintiff was permanently injured and the injuries calculated to disable him from engaging in farming; (5) the special exception to the plaintiff's fourth prayer, that there was no evidence legally sufficient to show that the defendant's truck overtook the plaintiff's automobile from the rear or passed, or attempted to pass it on the right side thereof.

The plaintiff's first prayer instructed the jury as a matter of law that the motor vehicle laws of the state provide that "all vehicles, etc., overtaking another vehicle going in the same direction shall pass to the left of the vehicle so overtaken, provided the way ahead is clear of approaching traffic and the operator signals the vehicle intended to be passed by the use of his horn or other signaling device," and then goes on to say that if they should find the defendant's truck overtook the plaintiff's automobile, both going in the same direction, and that the truck did not pass to the left of the plaintiff's automobile so overtaken, although the way ahead was clear of approaching traffic, and that the defendant's truck at the time of the accident was "attempting to pass the automobile of the plaintiff while going in the same direction and which had been overtaken as aforesaid, if the jury so find, on the right hand side of the plaintiff's car, and shall further find that the failure to pass the plaintiff's car on the left side thereof. and the attempt to pass the plaintiff's car on the right side thereof was the proximate cause of the accident testified to in this case, then if the jury so find they are instructed that their verdict must be for the plaintiff."

There is no evidence that the road ahead was not clear, and it avails the defendant nothing whether it was clear or obstructed. It may be that there is no evidence, and certainly there is no statement in the evidence, to the effect

that the defendant's truck was attempting to pass the plaintiff's automobile on the right; but if he was not attempting to pass him on the right, then he had no excuse for the accident at all, and it could not have affected the jury's conclusion whether he said he was trying to pass him on the right or trying to run into him from the rear. It would have been more in keeping with the facts to have ascribed the collision to the reckless running of the defendant's truck —that it was going down hill at a too rapid rate of speed, with the driver neglecting to control the truck or with the same beyond his control, and his failure to keep a reasonably safe distance behind the plaintiff's automobile.

It is provided, among other things, by section 195 of article 56 of the Code, that a person operating a motor vehicle "upon approaching a crossing or intersecting public highways, or a bridge, or a sharp turn, or a curve, or a steep descent, * * * and in traversing such crossing, bridge, turn, curve or descent, * * * shall have the same under control and shall reduce its speed to a reasonable and proper rate," and by section 194, "No person shall operate a motor vehicle of any kind as defined in this subtitle over any public highway of the state recklessly, or at a rate of speed greater than is reasonable and proper, having regard to the width, traffic and use of the highway; or so as to endanger the property and life or limb of any person"; and by section 171 of the same article, that "nothing in the subtitle (motor vehicles) shall be taken in any way to add (to) or detract from the right of any person injured in his person or property by the negligent operation of a motor vehicle to sue and recover damages as in the case of the negligent use or operation of other vehicles, and the violation of any provision of this subtitle shall not be taken to give any right of action to any individual who would not be entitled to the same in the absence of such provision."

It has been held by this court in *Chiswell v. Nichols,* 137 Md. 291, that a prayer was defective because the jury were told without regard to any of the facts of the case that "if they found that he (the defendant) had not complied with

said rules and regulations their verdict should be for the plaintiff." "Where there is a violation of the law of the road, either common law or statutory, there is no liability unless such violation or negligence of the defendant is a proximate cause of the injury." *Elliott on Roads and Streets* (4th Ed.), sec. 1083-1, and cases there cited. In *Gittings v. Schenuit*, 122 Md. 282, 285, it is said that "the mere violation of an ordinance or statute by a defendant will not of itself support an action for injuries sustained, but it must be shown that the act which constituted the breach of the ordinance or statute was the proximate cause of the accident"; and this statement was cited with approval in *Hopper, McGaw & Co. v. Kelly*, 145 Md. 161, 169.

In the instant case the criticism of *Chiswell v. Nichols, supra*, was met by requiring the jury to find certain facts which have been heretofore mentioned, and while there may be some room for argument as to whether the defendant's truck was attempting to pass the plaintiff's car on the right side thereof, there can be no doubt that the result of the accident showed that the driver of the truck was appropriating the extreme right side of the road, regardless of the rights of the plaintiff or any others who might have been running ahead of him, and who were in danger of being overtaken by him; and the language of the prayer could not logically mean anything else. The truck driver, Rhudy, testified in part as follows: "Q. You say Mr. Knight was on the macadam? A. Yes, sir. Q. Now as you approached Stemmer's Run were you still in the same relative position? A. Yes, sir. Q. As Mr. Knight's car reached that bridge, how far were you back of him on the concrete? A. I should say around twenty feet. Q. And when he got on the bridge what did he do? A. He turned sharply to the right on to the shoulder. Q. It was on the bridge itself where he turned? A. Yes, sir. Q. And at that point it was the same level all the way across? A. It was; yes, sir. Q. When he turned up on there in front of you he was how close to you? A. I should think about twenty feet—fifteen to twenty feet. I am not positive. Q. Well, what happened? A. Well, he turned abruptly to the right

onto the concrete and to the left again, up the shoulder. Q.
And what happened? A. Well, I hit him. It was too close
for me to stop and I couldn't turn to the left. That is why
I hit him." And on cross-examination: "Q. You told the
jury very frankly that the reason for this accident was be-
cause, when Mr. Knight's car turned sharply to the right, you
could not turn to the left, and you could not stop your car,
and there was just nothing for you to do but go into him.
That is right, isn't it? A. Yes, sir."

There is no evidence that the truck driver gave the appel-
lee warning of his approach. If this is not an admission of
negligent driving and proximate cause, what is?

The plaintiff's second prayer, to which there was a special
exception, is the damage prayer, the part to which objection
is made being whether the injury "is in its nature perma-
nent and how far, if at all, it is calculated to disable him
(the plaintiff) from engaging in farming for which, in the
absence of such injury, he would have been qualified." The
plaintiff testified to the fact that, since the injury of August
14th, 1928, he has not been able to do the work on the farm
to which he had been accustomed. Dr. Archer testified that,
from his examination, the ailment from which he found the
plaintiff suffering probably "would continue to increase,"
and Dr. Richardson said, "It looks like it might be a chronic
case." Of such a prayer in *Howard County v. Pindell,* 119
Md. 69, 79, this court said that the question of the perma-
nency of the injury was properly left to the finding of the
jury. See *Benesch v. Ferkler,* 153 Md. 680.

The plaintiff's third prayer instructed the jury that there
was no legally sufficient evidence of contributory negligence
on the part of the plaintiff, and such a prayer is proper when
there is no legally sufficient evidence upon which to base a
finding of contributory negligence. *Consolidated Gas Co. v.
Getty,* 96 Md. 683, 690; *Von der Horst Brewing Co. v.
Amrhine,* 98 Md. 406, 414. The evidence offered by the
plaintiff showed no contributory negligence on his part, and,
unless such evidence was shown by him or his witnesses, the
burden of proof of contributory negligence was on the defend-

ant. *Taxicab Co. v. Ottenritter,* 151 Md. 525, 534; *Hopper, McGaw & Co. v. Kelly,* 145 Md. 161. On the other hand, the evidence offered by the defendant showed no negligence ·on the part of the plaintiff, while the evidence of the driver of the defendant's truck showed that his driving was the sole ·cause of the collision of which this case is the result.

The plaintiff's fourth prayer, which the appellant says is the "most remarkable proposition that has ever been submitted to this or any other court," tells the jury as a matter ·of law that the plaintiff "had the right to drive upon any part of said roadbed, including the concrete shoulders thereof, and in driving on said road and shoulders had the right to change from the left to the right side thereof, or from the ·right to the left side thereof, so as not to interfere with traffic traveling in the opposite direction, and * * * that there was no duty incumbent upon him, the said plaintiff, to anticipate ·or expect an automobile travelling in the same direction as the plaintiff's car was traveling, to overtake his, the plaintiff's automobile from the rear, and pass or attempt to pass his automobile on the right side thereof." This prayer may .appear to allow a driver too much room on a broad highway, but in effect it is much the same rule as stated in *Huddy on Automobiles* (8th Ed., sec. 292), which is: "One vehicle is .allowed to occupy any part of the road so long as that particular portion is not being used or sought to be used by an-·other." See cases there cited. "It is a general rule that one may travel upon any part of a highway not occupied at the time by another; but if he meets another traveler, whom he ·desires to pass or who desires to pass him in either direction, there are certain rights and duties which each must observe in order to avoid a collision. *Elliott on Roads and Streets* (4th Ed.), sec. 1079; *Johnson v. Shaw,* 204 Mass. 165.

It is provided by section 209 of article 56 of the Code that "all vehicles, motor, horse-drawn or otherwise, when being ·driven upon the highways of this state, upon meeting others, shall turn to the right of the center of the highway so as to pass without interference, and in rounding curves shall keep as far to the right of the road as reasonably possible; and

any vehicle overtaking another going in the same direction shall pass to the left of the vehicle so overtaken provided the way ahead is clear of approaching traffic and the operator signals the vehicle intended to be passed by the use of his horn or other signaling device." We do not find any evidence in this record of a violation of this provision by the plaintiff, and nothing in the statement of the plaintiff's rights in the fourth prayer inconsistent with the provisions of the statute under the circumstances testified to in this case. So far as this record discloses, the only other vehicle in the immediate vicinity of the plaintiff's car at the time of the collision was the defendant's truck. The driver of the truck admitted that he did not blow for the right of way, that his car was running too rapidly for him to stop in time to avoid the collision, and that he plowed into the plaintiff's car on the extreme right of the road. He violated every provision of the law, the purpose of which was to prevent just such accidents as the one here sued for.

The fourth prayer will cease to be an authority on the rights of vehicles as to all cases arising after April 2nd, 1929, as section 209 has been amended by the Act of 1929, ch. 224, so as to provide that "all vehicles, motor, horse-drawn or otherwise, when being driven upon the highways of the state, shall at all times keep to the right of the center of the highway upon all highways of sufficient width," etc.

This disposes of the defendant's first, 1A, second and third prayers, which asked for directed verdicts for the defendant, and of its eleventh prayer, which sought an instruction to the effect that there was no legally sufficient evidence of permanent injury. The defendant's seventh, eighth, ninth, eleventh, and thirteenth prayers, each in some respect sought the submission to the jury of the issue of contributory negligence, which, in our opinion, the record fails to show, and they were all properly refused. The defendant's tenth prayer was a request for an instruction that under the evidence in this case there was no duty imposed upon the driver of the defendant's truck to sound his horn preceding the happening of the accident. This prayer violates the rule prescribed by

section 209 of article 56, *supra,* and was properly refused. The opinion we have expressed of the defendant's rejected prayers carries with it this court's approval of the ruling of the trial court sustaining the plaintiff's special exceptions to the defendant's third, fifth, and eighth prayers.

Finding no error in any of the rulings on the prayers and evidence, the judgment appealed from will be affirmed.

*Judgment affirmed, with costs to the appellee.*